Robert J. McKennon (SBN 123176) *rm@mckennonlawgroup.com*
Andrea Soliz (SBN 243302) *as@mckennonlawgroup.com*
**McKennon Law Group PC**
20321 SW Birch Street, Suite 200
Newport Beach, California 92660
Phone:  949-387-9595  |  Fax:  949-385-5165

Attorneys for Plaintiff Brenda McGuire

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION

| | |
|---|---|
| BRENDA MCGUIRE,<br><br>        Plaintiff,<br><br>vs.<br><br>LIFE INSURANCE COMPANY OF NORTH AMERICA; and DOES 1 through 10, inclusive,<br><br>        Defendants. | Case No.:<br><br>Action Filed:<br><br>Trial Date:<br><br>**COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES**<br><br>[Filed Concurrently With:<br>  -  Civil Cover Sheet;<br>  -  Summons; and<br>  -  Certification of Interested Parties] |



**INTRODUCTION**

1.     This case involves a disability claim brought by Plaintiff Brenda McGuire ("Plaintiff"), a community relations manager who reported that severe pain caused by degenerative disc disease, cervical and lumbar disc herniations, multilevel spondylosis and cervical nerve-root impingement prevented her from performing the substantial and material duties of her occupation.  Due to her medical condition, Plaintiff was forced to stop working in April 2017.  She was a participant in her employer's welfare benefit plan that provided long-term disability coverage through Defendant Life Insurance Company of North America ("LINA").  She filed a disability claim with LINA, which was denied because LINA incorrectly determined that the medical records did not support restrictions and limitations that would preclude her from performing her job functions.  As detailed herein, the evidence in the administrative record unequivocally shows that Plaintiff was, and is, disabled from performing the duties of her own occupation, or any occupation, due to severe symptoms, including chronic neck and back pain, leg pain, foot pain, leg weakness and numbness and tingling in her extremities.  Therefore, LINA's denial decision was unreasonable and contrary to the medical evidence.

**JURISDICTION AND VENUE**

2.     Plaintiff brings this action to recover benefits and to enforce and clarify her rights under Section 502(a)(1)(B) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1132(a)(1)(B).  This Court has subject-matter jurisdiction over Plaintiff's claim pursuant to ERISA Section 502(e) and (f), 29 U.S.C. Section 1132(e) and (f), and 28 U.S.C. Section 1331.

3.     Venue lies in the Central District of California, Southern Division pursuant to ERISA Section 502(e)(2), 29 U.S.C. Section 1132(e)(2), because Plaintiff resides in this district, some of the alleged breaches occurred in this district and the ERISA-governed plan at issue was administered in part in this district.

**THE PARTIES**

4.      Plaintiff is an individual who, at all times relevant to this action, was a citizen of the State of California and a resident of the City of Anaheim in Orange County, California.  Further, at all times relevant to this action, Plaintiff was a participant, as defined by ERISA Section 3(7), 29 U.S.C. Section 1002(7), in the employee welfare benefit plan (the "Plan") established by her former employer Republic Services, Inc. ("Republic Services"), which is at issue in this action.

5.      LINA, at all times relevant, administered long-term disability ("LTD") benefits provided to Plan participants, including Plaintiff, by issuing group policy number FLK-0980116 (the "LTD Policy") to Republic Services.  The LTD Policy and the Plan promised to pay disability benefits to Plaintiff should she become disabled.  LINA has acted as a claims administrator and as an ERISA claims fiduciary of the Plan.

6.      The true names and capacities, whether individual, corporate, associate or otherwise, of the defendants named herein as DOES 1 through 10, inclusive, are unknown to Plaintiff at this time, who therefore sues DOES 1 through 10 by fictitious names and will ask leave of the Court to amend this Complaint to show the true names and capacities of DOES 1 through 10 when the same are ascertained.  DOES 1 through 10 are sued as principals and/or agents, servants, attorneys and employees of said principals, and all the acts performed by them were within the course and scope of their authority and employment.  Plaintiff is informed and believes and thereupon alleges that each of DOES 1 through 10 is legally responsible in some manner for the events referred to herein, and directly and proximately caused the damages and injuries to Plaintiff as hereinafter alleged.

**FACTUAL BACKGROUND**

7.      Plaintiff began working for Republic Services in 1981.  At the time she became disabled on April 18, 2017, she was employed as a Community Relations Manager.  She has not worked for Republic Services or at any other company since

2

April 17, 2017.  As Community Relations Manager, Plaintiff performed a wide range of duties for Republic Services, a company providing recycling and waste-disposal services to over 14 million customers.  Plaintiff was responsible for coordinating and organizing efforts to represent Republic Services favorably in the community with the goal of retaining and expanding business.  Plaintiff's job duties included planning programs to promote good will with community leaders, supervising charitable contributions programs, assisting with marketing efforts, working with the corporate Web administrator to manage the local company Website, providing monthly reports to the local management team, serving as the liaison between Republic Services and the community and attending local Chamber of Commerce functions and city council meetings.  Her job required frequent interaction with community members, company managers and customers.  She worked in a fast-paced, challenging environment that required maintaining focus and concentration for extended periods of time and working long hours.  The physical requirements of the job consisted of prolonged sitting, standing, walking, bending, repetitive hand movements, simple and forceful grasping, keyboarding, driving and lifting up to 20 lbs. per day.  According to LINA's vocational assessment, the cognitive demands of Plaintiff's position included: directing, controlling or planning activities of others; influencing people in their opinions, attitudes and judgments; performing a variety of duties; dealing with people; and making judgments and decisions.

8.     Pursuant to the terms and conditions of the Plan, Plaintiff is entitled to LTD benefits because she met and continues to meet the LTD Policy's operative definition of "Disability/Disabled" and the other conditions necessary to qualify for LTD benefits during the requisite time period.  The LTD Policy defines "Disability/Disabled," in pertinent part, as follows:

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:

1.  unable to perform the material duties of his or her Regular Occupation; and

2.  unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.

After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:

1.  unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and

2.  unable to earn 60% or more of his or her Indexed Earnings.

The Policy defines **Regular Occupation** as follows:

The occupation the Employee routinely performs at the time Disability begins.  In evaluating the Disability, the Insurance Company will consider the duties of the occupation as it is normally performed in the general labor market in the national economy.  It is not work tasks that are performed for a specific employer or at a specific location.

9.      Under the terms of the LTD Policy, the "Benefit Waiting Period" is 180 days, after which Plaintiff is entitled to 50% of her monthly pre-disability earnings. The monthly benefit amount can be adjusted to account for other benefits received, and is payable until she reaches age 67, or, in Plaintiff's case, to December 8, 2029.

10.     Plaintiff has met the LTD Policy's definition of "total disability" during all relevant periods of time because she suffers from chronic pain caused by advanced degenerative disc disease with bilateral disc herniation and broad-based disc protrusions and bilateral foraminal nerve-root impingement in her cervical spine and multi-level degenerative disc disease in the lumbar spine.

11.     Plaintiff's condition stems from a work-related fall that occurred in December 2005 when she fell backward off of a stage onto a concrete floor.  Shortly thereafter, she began to experience intense pain in her neck, stabbing pain in her shoulders and numbness and tingling in her right arm and hand.  In 2006, she filed a worker's compensation claim and received medical treatment via her worker's compensation insurance carrier.  She was evaluated by orthopedic doctor Navid

4

Ghalambor, M.D., who recommended physical therapy.  With treatment, she was able to manage her symptoms and continue working.  However, the pain never resolved completely and, over time, the pain worsened.  She also developed debilitating pain in her back, hips, leg and foot.  By April 2017, Plaintiff's medical condition had deteriorated to the point that it interfered with her ability to adequately perform her job duties.  Due to the pain, it became impossible for her to concentrate on work tasks or maintain the sustained energy level required of her position.  She also had difficulty typing, reading, writing, sitting, standing and driving, which interfered with her ability to perform her job functions.

12.    Due to the chronic, ongoing nature of her condition, Plaintiff has sought medical treatment at various times between 2006 and the present.  More recently, in June 2013, she was evaluated by Dr. Ghalambor for her cervical spine complaints and was again prescribed physical therapy.  She received physical therapy treatment from July to August 2013 and again from April to May 2014.  These treatments were received as part of Plaintiff's ongoing worker's compensation case.  She also underwent an MRI of the cervical spine on March 17, 2014, which revealed generalized disc desiccation, multilevel degenerative disc disease, neural foraminal narrowing and reversal of the normal cervical lordosis.  During this time, Plaintiff was again able to work through her pain and continue her employment with Republic Services.  In 2016, she experienced another flare-up of pain, and she received approximately two months of chiropractic treatment with Kevin J. Kuwabara, D.C. from October 17 through December 28, 2016.

13.    Because her pain symptoms had not resolved over the years, Plaintiff's primary treating physician at the time, Dr. Ghalambor, referred her for a spinal surgeon consult.  On February 16, 2017, she was evaluated by orthopedic surgeon Kambiz Hannani, M.D.  At this visit, Plaintiff complained of neck pain and stiffness that radiated into her right arm.  After examining her, Dr. Hannani diagnosed her with neck pain and cervical radiculopathy.  In his report, Dr. Hannani stated, "at this

point, she can have injection/surgery/or live with the pain", signaling that Plaintiff was already a surgical candidate at that time.  However, Plaintiff opted for a more conservative treatment approach and agreed to try an epidural steroid injection.  Dr. Hannani also recommended that Plaintiff obtain an updated cervical spine MRI, which was completed on March 14, 2017.

14.     Plaintiff returned to Dr. Hannani for further orthopedic evaluations on March 21, May 8, June 8 and July 12, 2017.  On March 21, Dr. Hannani noted that Plaintiff's cervical MRI showed foraminal stenosis, significant at C5-6 and lesser at C4-5.  He prescribed an epidural steroid injection on the right C5 and C6 levels, which Plaintiff received on April 26, 2017.  At the May 8 visit, Dr. Hannani noted that the injection did not alleviate Plaintiff's pain and he recommended a nerve test before proceeding with surgery.  He also prescribed eight sessions of physical therapy.  At the June 8 evaluation, Dr. Hannani noted that the physical therapy sessions had not helped Plaintiff and that her nerve testing result was negative.  He stated that Plaintiff had now tried all conservative care for an extended, ongoing period of time and that Plaintiff was interested in discussing surgery.  Dr. Hannani referred her for cervical X-rays, which were completed and showed significant collapse at C5-6.

15.     In the meantime, Plaintiff continued to treat with Dr. Ghalambor.  On April 18, 2017, Dr. Ghalambor's office noted that Plaintiff's neck pain was getting worse, that a cervical MRI had revealed posterior disc bulges and that she was having difficulty working.  Dr. Ghalambor's office also confirmed her diagnoses of cervical radiculopathy and cervical degenerative disc disease.  She was placed off of work until April 30, 2017.  On May 1, 2017, she was examined again and, at that time, Dr. Ghalambor's office stated that Plaintiff was totally disabled, with no return-to-work date noted in the report.  The report noted that she had increased pain in her neck, radiating to her right arm and hand, and that the pain was worse when keyboarding.  On May 17, 2017, Plaintiff underwent an electrodiagnostic study

("EMG") of the bilateral upper extremity, which showed a right moderate sensorimotor and left borderline primarily sensory median neuropathy across the wrist.  Plaintiff treated with Dr. Ghalambor's office again on June 5, June 29, July 17, August 28, November 9 and December 18, 2017, and January 15 and February 26, 2018.  At most visits, Dr. Ghalambor's office noted Plaintiff's ongoing complaints of neck pain radiating into her arm and hand and that chiropractic and acupuncture treatments had not helped to alleviate her pain.  At each visit, Dr. Ghalambor's office also confirmed her diagnoses of cervical radiculopathy, cervical degenerative disc disease and cervical disc bulges.  At the January 15, 2018 and February 26, 2019 visits, Dr. Ghalambor listed Plaintiff's work restrictions as no driving more than 90 minutes per day and keyboarding for no more than four hours per day.

16.     While treating with Dr. Ghalambor, Plaintiff requested another spinal surgeon referral to obtain a second opinion regarding surgery.  Dr. Ghalambor referred Plaintiff to Mark E. Anderson, M.D.  Plaintiff was evaluated by Dr. Anderson on August 14, 2017.  In his report, Dr. Anderson described Plaintiff's complaints as consisting of "posterior cervical, interscapular and dorsal right shoulder aching and burning with numbness and burning into the right upper extremity . . . .  It is constant, increased with activity and awaken[s] her at night."  He also stated that she had radicular pain in the right upper extremity when she turned her head to the right, stabbing pain in the interscapular area and numbness and sharp pain in her right arm.  He also noted that her symptomology had waxed and waned but overall was worsening and that she could only sit comfortably for ten minutes, stand or walk for one hour and ride in a car for ten minutes.  He also noted that she was functionally impaired secondary to her pain and that she could not do her work.  His physical examination of Plaintiff revealed that she was weak in both upper extremity grips and that she had a positive Lhermitte's sign for neurological

7

impingement.  He recommended a repeat cervical spine MRI, which was performed on September 12, 2017, and he concluded that she was totally temporarily disabled.

17.     Plaintiff consulted with Dr. Anderson again on September 15, 2017. Based on his review of the MRI, he concluded the following: **She had a very large herniated disc at C5-6; there were fragments in the C5-6 canal; the C6 nerve-root foramen was filled with debris and showed severe neurological compromise; and there were cervical degenerative changes at C4-5 with a marked right foraminal stenosis at that level**.  Dr. Anderson advised Plaintiff that she was a surgical candidate and recommended that she undergo a cervical discectomy and fusion at C4-5 and C5-6.  He submitted a request for authorization to Plaintiff's worker's compensation carrier.  The request was approved, and surgery was scheduled for October 31, 2017.  However, on October 25, 2017, given the risks of back surgery, Plaintiff notified Dr. Anderson's office that she had decided to cancel the surgery and wished to continue with chiropractic and acupuncture care, which she felt was helping her, but that she would consider going forward with the surgery at a later date if her current progress halted.

18.     Between June 2017 and May 2019, Plaintiff actively sought treatment for her severe neck, shoulder and arm pain and presented for numerous acupuncture treatments, chiropractic visits and physical therapy, none of which provided any sustained improvement in her symptoms.  She received 11 acupuncture treatments between June and August 2017 with licensed acupuncturist Changok Kim, M.S., L.Ac. at Renew Acupuncture Clinic.  At the initial visit, she informed Dr. Kim that her main health issue was radiating pain from her neck down to her right arm and that she also felt lower-back pain and right-foot pain.  At each visit, she continued to report ongoing neck pain.  She received chiropractic treatment with David J. Topping, D.C. at Topping Chiropractic from September 2017 through September 2019.  She reported to Dr. Topping that she had neck pain and radiating pain in her arm and hand and that she had trouble focusing.  Throughout her treatment with Dr.

Topping, she consistently reported that she felt the following: neck tightness; neck, shoulder and arm pain; weakness in her right arm; right-hand pain; and hand numbness.  She also reported anxiety about her continued arm pain, dizziness, sleeplessness and vertigo.  Beginning in early 2018, she began to report mid- and lower-back pain and lower-leg pain.  In September 2018, she stated that she had both good and bad days and, in November 2018, she stated that she "hurt all over."  Dr. Kim also diagnosed her with herniation of discs at L3- L6, at L5 and L6 and bone spurs pressing on her nerves.

19.     In April 2018, at the recommendation of Dr. Ghalambor, Plaintiff consulted with pain-management specialist Raafat N. Mattar, M.D.  She was evaluated by Dr. Mattar on April 11, May 9, November 17 and December 5, 2018 and January 9, 2019.  At the initial evaluation on April 11, 2018, Plaintiff reported that her neck pain was giving her headaches, that her hip bothered her when she sat in an office chair and that her neck and shoulder pain felt like a knife and was an "extreme painful shooting pain."  She stated that the pain worsened with sitting, bending forwards and backwards, coughing, sneezing and working.  Dr. Mattar's physical examination of Plaintiff's cervical spine revealed tenderness to palpation over the right paraspinal muscles, pain with right lateral rotation and positive Spurling sign on the right.  Dr. Mattar recommended additional acupuncture treatment, which Plaintiff received with U.S. HealthWorks Medical Group.  She received a course of acupuncture treatment from June 6 through June 20, 2018.  Dr. Matter later recommended another course of acupuncture, which Plaintiff received from November 28 through December 21, 2018.  At the final evaluation with Dr. Mattar on January 9, 2019, he noted that Plaintiff now reported pain in her lower back, shooting down into her left leg.  She described the pain as dull, burning and throbbing and rated it a 7 out of 10.

20.     During this time, Plaintiff began treating with her current primary care doctor, Carl Buckhorn, M.D.  She first saw Dr. Buckhorn on April 10, 2018 and has

treated with him on at least 10 occasions from April 2018 to the present.  In early 2019, Dr. Buckhorn referred Plaintiff to Fullerton Physical Therapy to treat her lower-back pain.  Plaintiff was diagnosed with right lumbar radiculitis and received treatment at Fullerton Physical Therapy twice per week from January 31 through May 29, 2019.  A progress report dated April 5, 2019 noted that Plaintiff had an antalgic gait related to right-leg pain and that all lumbar ranges of motion were painful.  The report also noted that her overall pain frequency and intensity and her tolerance of physical activity were not progressing.  On May 23, 2019, it was noted that Plaintiff's lower-back pain and right-leg pain were still severe at times, she had difficulty sleeping and she had limited tolerance to sitting, standing and walking.  The report also stated that her pain intensity was slightly less when in regular attendance, but the relief was not long-lasting.

21.     Plaintiff underwent a lumbar spine MRI on October 16, 2018 which showed diffuse disc herniation measuring 4mm effacing the thecal sac causing narrowing of neural foramen that effaces the exiting nerve root. At L4-5 there was diffuse disc herniation measuring 4mm effacing the thecal sac causing narrowing of neural foramen that effaces the exiting nerve root. At L5-S I there was diffuse discovery herniation with central disc protrusion measuring 3mm with effacement of the thecal sac.

22.     On June 4, 2019 Dr. Buckhorn submitted a "Medical Request Form" that stated Plaintiff's restrictions and limitations of back pain and "cervical/thoracic/lumbar spine arthritis" that caused her "chronic pain" and rendered her "unable to work."  He stated that she could not lift more than 15 lbs. and could not perform computer work because of her pain.

23.     Due to continuing complaints about her mid- and lower back, Dr. Buckhorn referred Plaintiff for an MRI and X-ray of her thoracic and lumbar spine. Plaintiff underwent the MRIs on September 23, 2019 and the X-rays on October 2, 2019.  The MRI and X-ray of the thoracic spine were normal; however, the MRI and

X-ray of the lumbar spine revealed multiple degenerative disc disease and posterior-facet arthropathy.  The tests also revealed right neural foramina narrowing at L2-3, bilateral neural foramina narrowing at L3-4 and L4-5 and a bulging disc at L3-4 abutting the left emerging L4 nerve root.

24.     Meanwhile, Plaintiff was seen by Peter Newton, M.D. on October 8, 2018 for an Agreed Medical Evaluation ("AME") related to her worker's compensation case.  Dr. Newton issued supplemental AME reports on November 17, 2018 and April 6, 2019.  At the initial independent evaluation, he referred Plaintiff for cervical and lumbar spine MRIs, which were performed on October 16, 2018.  The MRI of the cervical spine revealed a 4mm disc protrusion at C4-5 and a 3mm disc protrusion at C5-6 and C6-7.  The lumber spine MRI revealed a 4mm disc protrusion at L3-4 and L4-5 and a 3mm disc protrusion at L5-S1.  After examining Plaintiff and reviewing her medical records, Dr. Newton diagnosed her as having chronic neck pain with underlying degenerative disc disease, thoracic spine pain secondary to chronic cervical and lumbar pain and chronic lower-back pain.  He also stated that her findings were consistent with positional radiculopathy that is caused by flexion and rotation of the spine.  Dr. Newton  stated that:

> Positional radiculopathy is caused with flexion and rotation of the spine.  Under normal circumstances, the nerves fit through the foramen as they exit the spine.  However, an individual with a compromised foramen due to degenerative stenosis or disc protrusions or a combination of the two will have symptoms with flexion and rotation.  As the canal closes down, this compromised canal will compress the nerves roots, causing such symptoms.  These symptoms are consistent with the objective findings on X-ray and MRI.

(Emphasis added).  **Dr. Newton further concluded that Plaintiff had "multiple levels of significant abnormality," as demonstrated by her cervical spine X-ray and MRI, and that "her objective findings on the X-ray and MRI verify her subjective complaints at multiple levels."  Finally, he concluded that the "above impairment rating is an accurate reflection of this applicant's current loss**

11

**Function as discussed in the activities of daily living section of my report, where it is noted that this applicant continues to have significant loss of function with activities of daily living."**

25.     On May 10, 2019, Plaintiff submitted an application for LTD benefits to LINA, based on her chronic neck and back pain, alleging a disability onset date in April 2017.[1]  She listed her medical condition as multi-level spondylosis with degenerative foraminal stenosis in the cervical spine; chronic lower-back, leg and foot pain; and disc protrusions in the cervical and lumbar spine.  She indicated that the cause of her injury was a fall off of a stage in 2005, as well as repetitive stress injury, and that she had been experiencing pain on and off since 2006.  She stated that she felt pain in her neck, arm, back, hips, leg and foot.  She also suffered from weakness in her leg and foot and had balance issues.  She stated that her condition made it difficult for her to walk, drive or type or stand up from a seated position, and that she was unable to sit for very long.  With her application, she submitted a Disability Questionnaire and Activities of Daily Living form.  In response to the question why she cannot work, she stated that she has difficulty turning her head, reading, using a computer, driving, walking, sitting and getting up from a chair.  She also stated that using a computer and other fine movements cause neck, arm and

_____

[1] Plaintiff did not immediately file a disability claim with LINA because she received worker's compensation benefits from April 21, 2017 through May 17, 2018, and she mistakenly believed that she could not apply for disability benefits while she was receiving worker's compensation benefits.  In May 2018, once her worker's compensation benefits ended, Plaintiff filed a short-term disability ("STD") claim with LINA.  By letter dated June 8, 2018, LINA informed Plaintiff that her STD claim was being denied because her condition was work related and that the STD policy contained an exclusion for disabilities resulting from work-related injuries.  At that time, Plaintiff was unaware that she also had LTD coverage with LINA.  The LTD Policy does *not* contain an exclusion for work-related disabilities.  She later learned of her LTD coverage and attempted to open an LTD claim with LINA in August 2018.  However, for unknown reasons, LINA failed to open an LTD claim at that time.  A claim file note dated May 29, 2019 stated that LINA "accepts reasoning for late filing due to Cx [claimant] having multiple previous voided and closed claims under other incident # for STD & LTD this was not Cx's first attempt at filing claim."  Therefore, LINA has agreed that Plaintiff's LTD claim is timely.

hand pain and that the pain extends to the upper and lower back, head, hip, legs and feet.

26.     In further support of her LTD claim, Plaintiff submitted a Medical Request Form ("MRF") and Physical Ability Assessment ("PAA") signed by Dr. Buckhorn on June 4, 2019.  In the MRF, Dr. Buckhorn reported Plaintiff's primary diagnosis as back pain and cervical/thoracic/lumbar spine arthritis.  He stated that she was unable to work due to chronic pain and that her restrictions included no lifting over 15 pounds and no computer work secondary to increased pain and migraines.  In the PAA, he indicated that Plaintiff could sit, stand, walk and reach only occasionally (for 0 to 2.5 hours per day).

27.     As part of its LTD claim-review process, LINA requested MRF and PAA forms from several of Plaintiff's treating physicians.  On May 21, 2019, Plaintiff's former acupuncturist, Dr. Kim, completed an MRF, stating that Plaintiff suffered from cervicalgia/neck pain caused by a bulging disc in the cervical spine and that her condition had slowly worsened.  Dr. Kim indicated that Plaintiff was limited in that she could not spend much time working on a computer, using a cell phone or reading books.  She also stated that she had last seen Plaintiff on August 8, 2017, so she could not comment on whether Plaintiff could return to work.  On June 3, 2019, Plaintiff's physical therapist at Fullerton Physical Therapy, Ron Cunningham, PT, completed a PAA in which he indicated that **Plaintiff could sit, stand, walk and reach for only 0 to 2.5 hours per day.**

28.     Meanwhile, due to her persistent, worsening neck pain and the lack of sustained improvement from conservative treatment over the past two years, Plaintiff decided to return to Dr. Anderson's office to discuss the possibility of surgery.  Dr. Anderson evaluated Plaintiff on July 19, 2019.  At this visit, she reported having ongoing neck and shoulder pain (which was currently a 7 out of 10) that was constant, increased with activity, awakened her at night and was gradually worsening.  She also reported right-arm pain associated with numbness and tingling

13

in her fingers and weakness in her right arm.  She stated that the pain felt like a hot poker going from the back of her neck into her upper arm.  She also stated that she could only sit for 10 minutes, stand for 30 minutes, walk for 20 minutes and ride in a car for 20 minutes at a time.  She advised Dr. Anderson that she had experienced a worsening of her symptoms and had reached her pain tolerance level.  Dr. Anderson indicated that she would need to have an updated cervical MRI and X-ray and then return to his office for further discussion.

29.     Prior to undergoing the updated MRI and X-ray, LINA informed Plaintiff by letter dated September 5, 2019 that it was denying her LTD claim.  It improperly concluded that the medical information did not support restrictions and limitations that would preclude Plaintiff from performing her own occupation. LINA relied solely on the opinion of its physician consultant, Joseph Sentef, M.D., M.P.H., M.B.A., who only conducted a paper review of Plaintiff's records.  Dr. Sentef summarily concluded, without having spoken to or examined Plaintiff and without having spoken to any of her treating physicians, that Plaintiff was not functionally limited and that no restrictions were medically indicated.

30.     There are many problems with Dr. Sentef's conclusions.  First, Dr. Sentef is LINA's paid consultant, used repeatedly by LINA in the past to give disability opinions, which demonstrates his obvious bias in favor of the insurance industry.  Further, Dr. Sentef specializes in occupational and family medicine and is therefore not qualified to render credible opinions regarding spinal or orthopedic illnesses.  Dr. Sentef has no specialized training in orthopedics and therefore does not have the proper expertise to give credible opinions regarding Plaintiff's very complex medical situation.

31.     Second, Dr. Sentef failed to examine Plaintiff and failed to speak with her or any of her treating doctors, even though the LTD Policy permitted it. Therefore, Dr. Sentef's opinion, based purely on a "cold file review" of Plaintiff's medical records, carries far less weight than the opinion of Plaintiff's treating

14

1  primary care provider, Dr. Buckhorn, who regularly examined her in person for two

2  years and consequently gained great insight into her work limits.  *See, e.g., Sullivan*

3  *v. The Prudential Insurance Co. of America*, 2014 WL 3529974, at *33 (E.D. Cal.

4  Jul. 15, 2014).  Furthermore, LINA's failure to have Plaintiff examined by its

5  physician consultant raises questions about the credibility of Dr. Sentef's opinion

6  and the thoroughness and accuracy of LINA's benefits decision.  *See Shaw v. AT&T*,

7  795 F.3d 538, 550 (6th Cir. 2015).

8       32.    Third, Dr. Sentef's opinion lacks adequate foundation because he did

9  not review all available records relevant to Plaintiff's claim.  Specifically, he did not

10  review Dr. Anderson's July 19, 2019 evaluation, in which Dr. Anderson stated that

11  Plaintiff's condition had deteriorated since his last examination of her and that she

12  had reached her pain tolerance saturation and wished to proceed with surgical

13  intervention.  Furthermore, he reviewed but ignored the significance of Dr.

14  Newton's AME reports that were independent examinations finding that Plaintiff

15  had significant functional impairment consistent with numerous objective findings.

16  Dr. Sentef's initial report was written on June 26, 2019; however, he issued two

17  addendums – one on July 18, 2019 and the other on September 4, 2019 – in which

18  he reviewed updated medical records.  It does not appear that LINA requested he

19  review Dr. Anderson's July 19 report and LINA failed to provide this report to Dr.

20  Sentef to review.  This is highly improper as its shows that LINA withheld critically

21  important medical information from Dr. Sentef.  Because Dr. Sentef did not have the

22  most recent medical reports that stated that Plaintiff's condition had worsened, that

23  she had significant functional impairment consistent with objective medical

24  evidence and that she was opting to proceed with surgery, his conclusion is

25  unreliable.

26       33.    Fourth, Dr. Sentef's opinion is vague and conclusory and focused on

27  cherry-picked statements from the medical records, while disregarding pertinent

28  evidence that supports Plaintiff's disability, including her subjective complaints of

intense neck and shoulder pain, numbness and weakness in her arm and severe back pain.  The medical record in this case, as summarized above, is replete with consistent reports of Plaintiff's ongoing complaints of neck, shoulder, arm, hand, back, leg and foot pain that interfere with her ability to sit, stand, walk, sleep and concentrate.  Dr. Sentef improperly ignored this evidence and presented his opinion in a conclusory fashion, making it unclear why he believed that Plaintiff did not have functional limitations when she continued to suffer from debilitating symptoms that made it impossible for her to sit, stand or walk for more than two hours in an eight-hour workday.

34.     To support his opinion, Dr. Sentef focused on cherry-picked findings from Plaintiff's medical records that either were irrelevant or painted an inaccurate picture of her disabling condition.  Specifically, he noted that Plaintiff's gait was reported as normal, she did not use any assistive devices and she had declined potential surgery.  Plaintiff's disability stems from her severe neck, shoulder and back pain and has nothing to do with her gait.  Therefore, the fact that her gait was reported as normal at certain office visits is irrelevant.  However, Dr. Sentef conveniently failed to mention that Plaintiff's gait was reported as **abnormal** on at least two occasions: at an April 5, 2019 session at Fullerton Physical Therapy (it was noted at that time that Plaintiff had an antalgic gait related to right-leg pain) and at a November 28, 2018 acupuncture session (abnormal posture/gait with restricted range of motion was noted).  Regarding the lack of assistive devices, Dr. Sentef appears to proffer a ridiculous standard that if a claimant does not require assistive devices for a medical condition, it does not qualify as a condition that could render the claimant unable to perform her work.  In regard to the declination of surgery, as detailed above, Plaintiff wished to pursue conservative treatments first before undergoing a serious, potentially life-threatening surgical procedure.  In any event, that issue is now immaterial because Plaintiff later opted to proceed with surgery

after reaching her maximum pain tolerance, and she did undergo the recommended cervical discectomy and fusion in January 2020.

35.     Dr. Sentef's report also mischaracterized key medical evidence.  He stated that no neurological deficits had been documented, that the EMG of the upper extremity was normal with no evidence of radiculopathy and that the MRI of the cervical spine was consistent with age-related changes.  In regard to neurological deficits, Dr. Sentef's statement ignored the numerous references in the medical records to Plaintiff's weakness in her right arm, as well as Dr. Anderson's physical examination findings from August 14, 2017, in which he noted that Plaintiff was weak in both upper-extremity grips and had a positive Lhermitte's sign for neurological impingement.  Additionally, according to the May 17, 2017 EMG report, the EMG testing did in fact reveal evidence of neuropathy, contrary to Dr. Sentef's assertion; the EMG revealed neuropathy across the wrist.  Regarding the MRI of the cervical spine, Dr. Sentef's conclusion that the results were consistent with "age-related changes" is outrageously false.  And, it completely disregarded Dr. Anderson's comment in September 2017 that Plaintiff was a surgical candidate and that the MRI from 2017 showed severe neurological compromise, a C6 nerve-root foramen that was filled with debris, a very large herniated disc and marked foraminal stenosis.  He ignored Plaintiff's MRI findings of the cervical spine that revealed a 4mm disc protrusion at C4-5 and a 3mm disc protrusion at C5-6 and C6-7.  He also ignored the lumber spine MRI findings that revealed a 4mm disc protrusion at L3-4 and L4-5 and a 3mm disc protrusion at L5-S1.  These are not merely "age-related" changes but, rather, are objectively verifiable severely abnormal debilitating changes not typically found in persons of Plaintiff's age and that prevented (and continue to prevent) Plaintiff from engaging in any full-time work.

36.     Dr. Sentef's report was cursory and deficient and ignored much of the objective evidence supporting Plaintiff's disability, as well as her subjective

17

complaints of pain.  Therefore, LINA should never have relied on this report as a basis on which to deny Plaintiff's LTD benefits.

37.     On October 14, 2019, Plaintiff underwent another cervical spine MRI and X-ray.  She returned to Dr. Anderson on November 20, 2019 to discuss the results.  According to Dr. Anderson, the X-ray revealed a loss of disc-space height and spondylosis at C5-6 and anterior subluxation and marked kyphosis at C4-5.  The MRI demonstrated **advanced degenerative disease with bilateral disc herniation and broad-based disc protrusion at C5-6, degenerative changes with annular bulge at C4-5 and clear bilateral foraminal nerve-root impingement at C5-6**. He stated that these findings were consistent with two-level cervical degenerative disc disease with neurological impingement.  Consistent with his previous conclusion in September 2017, he advised Plaintiff that she was a surgical candidate, and he recommended that she undergo an anterior cervical discectomy and fusion.  After Plaintiff's worker's compensation carrier authorized the procedure, she underwent the recommended surgery on January 16, 2020.

38.     On February 24, 2020, Dr. Buckhorn wrote a letter in support of Plaintiff's LTD claim.  In the letter, he firmly advocated for Plaintiff's continued disability.  He stated that, due to her chronic neck, shoulder, arm and back pain, she is totally disabled and prevented from performing the duties of her own occupation or any full-time work.  He noted that the pain causes difficulty with concentrating and makes working in front of a computer very difficult and painful for Plaintiff. He also stated that the level of pain that Plaintiff experiences would make sustained work tasks like typing, writing, reading, focusing and engaging in discussions nearly impossible.  He concluded his letter by stating, **"As a result of Plaintiff's cervical and lumbar spine condition and resulting restrictions and limitations, she is unable to perform the full-time duties of her occupation or any other employment at this time and in the foreseeable future."**  Dr. Buckhorn's letter

1    was based on his numerous *in-person* examinations of, and discussions with,

2    Plaintiff over the past two years.

3         39.    On February 28, 2020, Plaintiff, through her counsel, sent a letter to

4    LINA, appealing the September 5, 2019 denial of her LTD claim.  In the appeal

5    letter, Plaintiff pointed out the many deficiencies in LINA's claims-review process,

6    as detailed above, and demanded that LINA reverse its erroneous denial decision.

7    Included with the appeal letter were updated medical records (all of which have

8    been discussed herein), Dr. Buckhorn's February 24, 2020 disability certification

9    letter and personal statements from Plaintiff, her family and her friends.

10        40.    In Plaintiff's personal statement, she explained how her disability has

11   had a huge negative impact on her life.  She had worked her entire adult life at

12   Republic Services and loved her job.  Prior to her disability, she was able to function

13   at a high level and meet the challenging demands of her occupation.  She regularly

14   worked 10 to 12 hours per day and was very good at her job.  However, in April

15   2017, the pain became so severe that it interfered with her ability to concentrate,

16   type, read, write, sit, stand or drive.  She suffered from stabbing pain in her

17   shoulders and arms and intense pain in her neck that made it difficult for her to hold

18   up or turn her head.  She was having (and still does have) difficulty focusing due to

19   her pain and she had trouble sleeping, which led to constant fatigue.  She explained

20   that s**he cannot sit or stand for more than one to two hours at a time** and has

21   difficulty standing up after sitting for any length of time.  Her continued pain and

22   associated limitations make it impossible for her to perform any type of full-time

23   work, let alone the 10- to 12-hour rigorous work days required of her prior

24   occupation as a Community Relations Manager.

25        41.    With her appeal, Plaintiff also submitted statements from her close

26   friends, Carol Van Ahlers and Linda Newby, and her daughter, Meghan McGuire.

27   In Ms. Van Ahlers' statement, she said that she has known Plaintiff for over 30

28   years and has witnessed the decline in Plaintiff's health over the past few years.  She

stated that she and Plaintiff had previously taken daily walks, but can no longer do so because of Plaintiff's extreme pain in her neck, back, leg and feet.  When they do go for a walk, it is at a much-reduced speed.  Ms. Newby described Plaintiff as a hard worker and dedicated volunteer for many local charities.  She stated that, for the last two years, she has witnessed Plaintiff in constant pain and unable to work or even have the energy to attend charitable meetings.  In Meghan McGuire's statement, she described how she has had to watch her mother's health deteriorate over the past few years and how her mother has gone from being an avid walker to having days when she cannot walk from her bedroom to the kitchen without pain.  She stated that she believes that it would be impossible for her mother to return to work at this point due to her ongoing pain.

42.     By letter dated April 23, 2020, LINA informed Plaintiff that it had reviewed her appeal and concluded that an adverse benefit decision was warranted.  LINA included a copy of a peer-review report written by its paid physician consultant, Krishna Padiyar, M.D., that LINA had relied on during the appeal-review phase.  In Dr. Padiyar's report, dated April 16, 2020, he found that functional impairment was supported from April 18 through August 13, 2017 and from January 16, 2020 (when Plaintiff underwent cervical fusion) forward.  He erroneously concluded – without having examined or spoken to Plaintiff – that functional impairment was not supported from August 14, 2017 through January 15, 2020.

43.     On May 22, 2020, Plaintiff, through her counsel, sent a letter to LINA, responding to Dr. Padiyar's findings.  The letter advised LINA that Dr. Padiyar's report was conclusory and deficient and did not establish that Plaintiff had the capacity to work in her own occupation from August 14, 2017 through January 15, 2020.  The letter asserted that Dr. Padiyar and the vendor through which LINA retained him (Dane Street, LLC) are LINA's paid consultants used repeatedly by LINA in the past to give disability opinions, and that a court will view LINA's claim denial with skepticism because it relied on financially conflicted, biased consultants

20

who are sold out to the insurance and employer industry. *See Demer v. IBM*, 835 F.3d 893, 901-03 (9th Cir. 2016); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003).

44.     The letter also argued that Dr. Padiyar, who specializes in occupational medicine, does not have the proper expertise to give credible opinions regarding Plaintiff's spinal and orthopedic illnesses.  Just like Dr. Sentef, Dr. Padiyar has no specialized training in orthopedics, neurosurgery or pain management and, as such, is unqualified to review Plaintiff's complicated medical condition.  ERISA requires an insurer to use on appeal a reviewing physician who has "appropriate training and experience in the field of medicine involved in the medical judgment." *See Fleming v. Unum Life Ins. Co. of Amer.*, 2018 WL 6133859, *10 (C.D. Cal. Nov. 20, 2018) (citing 29 C.F.R. § 2560.503-1 (h)(3)(iii)).  If the physician does not have such training and experience, the insurer violates ERISA, and its doctor's opinion should be given little, if any, weight. *Id.*; *see also Kunin v. Benefit Tr. Life Ins. Co.*, 910 F.2d 534, 535 (9th Cir. 1990) (finding that the administrator erred in relying on the opinion of a doctor who had no experience in treating autism).

45.     In addition, Dr. Padiyar failed to speak with any of Plaintiff's treating physicians, especially her primary care doctor, Dr. Buckhorn, who regularly treated her for two years, or her neurosurgeon, Dr. Anderson, who recommended and performed cervical spinal surgery on Plaintiff.  Both of these physicians have examined Plaintiff in-person on multiple occasions and, consequently, have gained great insight into her medical condition and work limits.  In addition, Dr. Buckhorn has opined that Plaintiff is unable to engage in full-time work based on his in-person examinations of, and discussions with, Plaintiff.  Dr. Padiyar's failure to consult with Plaintiff's treating physicians evidences the bias and unreliability of his conclusions.

46.     The letter also explained that Dr. Padiyar had ignored critical findings contained in the medical records and, instead, had improperly focused on one

normal exam to support his obviously incorrect conclusion. His opinion appeared to be based solely on an allegedly normal EMG from August 14, 2017. In his report, he stated, "by 08/14/2017 EMG, the right upper extremity was noted to be normal, with no correlating clinical findings . . . At this point, there was no support for functional impairment based on the lack of diagnostic correlation to clinical findings." He also concluded (incorrectly) that there were no clinical findings to support functional limitations with respect to the lumbar spine. His brief report focused primarily on Plaintiff's extremity and lumbar pain, but, as documented in the claim file, Plaintiff's disability was based on much more than extremity and lumbar issues. She suffers from severe, intense neck and shoulder pain for which she underwent a cervical discectomy in January 2020. Her September 2017 cervical-spine MRI revealed severe neurological compromise, a C6 nerve-root foramen that was absolutely filled with debris, a very large herniated disc and marked foraminal stenosis. Her October 2018 cervical spine MRI revealed a 4mm disc protrusion at C4-5 and a 3mm disc protrusion at C5-6 and C6-7. A lumber spine MRI conducted in October 2018 revealed a 4mm disc protrusion at L3-4 and L4-5 that impinges on the exiting nerve roots and a 3mm disc protrusion at L5-S1. Her most recent cervical spine MRI, performed in October 2019, revealed that Plaintiff suffers from advanced degenerative disc disease with bilateral disc herniation and broad-based disc protrusions and clear bilateral foraminal nerve-root impingement in her cervical spine. And her September 2019 lumbar MRI revealed multi-level degenerative disc disease and bulging discs abutting the L4 nerve roots in the lumbar spine. In addition, in October 2018, Dr. Newton concluded that Plaintiff had multiple levels of significant abnormality, as demonstrated by her cervical-spine X-ray and MRI, and that her objective findings on the X-ray and MRI verified her subjective complaints. On June 4, 2019, Dr. Buckhorn reported that Plaintiff was unable to work due to chronic pain and that she could sit for only up to 2.5 hours per day. This is obvious, overwhelming evidence that, from August 14,

2017 to January 15, 2020 (and onward), Plaintiff continued to suffer from chronic neck and back pain caused by herniated discs, degenerative disc disease and severe neurological compromise and, therefore, was unable to work in her prior occupation, just as her treating doctor (Dr. Buckhorn) concluded.  Dr. Padiyar made no mention of these critical findings in his analysis, but, instead, improperly focused on one normal exam.

47.    On May 26, 2020, Plaintiff, through her counsel, submitted a second letter from Dr. Buckhorn in support of her appeal.  In his letter, dated May 20, 2020, Dr. Buckhorn explained that Plaintiff had failed conservative management for her pain, was presently a chronic pain patient and, in his opinion, was unable to seek gainful employment due to her chronic pain condition.

48.    Despite the substantial medical evidence supporting Plaintiff's total disability, including the medical records and opinions of her treating physicians (Drs. Buckhorn and Anderson) and of an independent medical examiner (Dr. Newton), LINA deferred to the opinion of its paper reviewer and upheld the denial of Plaintiff's claim, by letter dated June 23, 2020.  LINA's denial letter mirrors the deficient reasoning of Dr. Padiyar's report.  As demonstrated above, there was clearly no basis for Dr. Padiyar to conclude that Plaintiff's file did not support restrictions and limitations during the relevant time period, and it was therefore unreasonable for LINA to rely on his opinion to support its claim denial.

49.    Given the foregoing evidence, it is without dispute that Plaintiff was and is disabled from performing the duties of her own occupation, or any occupation, due to her complex cervical and lumbar spine issues – including multi-level degenerative disc disease, cervical and lumbar nerve-root impingement, disc protrusions and foraminal stenosis.  These conditions cause severe symptoms, including stabbing pain in her neck and shoulders, numbness and weakness in her right arm and hand and pain in her back, legs, hips and feet – all of which interfere with her ability to sit, stand, walk, sleep and concentrate.  Her restrictions and

1    limitations are supported, not only by the opinions and reports of her treating

2    physicians and an independent medical examiner (Dr. Newton), but by multiple

3    objective tests, including various MRI scans and X-rays, as well as by her own

4    subjective reports of pain.

5         50.    Here, Plaintiff's treating physician, Dr. Buckhorn – who examined

6    Plaintiff in person regularly for two years – certified in LINA's MRF and PAA that

7    Plaintiff was unable to perform the full-time duties of her own occupation, based on

8    his exam observations and objective testing.  Dr. Buckhorn confirmed this opinion

9    in his letter dated February 24, 2020.  The opinions of Plaintiff's highly qualified

10   treating physician, who regularly examined the patient for years and spoke with her

11   in detail, carry far more weight than those of LINA's "paper reviewers," because he

12   had a better opportunity to assess Plaintiff's credibility and functional abilities.

13   And, the opinion of an independent medical examiner (Dr. Newton) should also

14   carry far more weight than those of LINA's paper reviewers.  *See Williams v. United*

15   *Omaha*, 2013 WL 5519525, at *12 (N.D. Ala. Sept. 30, 2013), citing *Black &*

16   *Decker*, *supra*, 538 U.S. at 832.

17        51.    Courts have typically afforded greater weight to the opinions of

18   physicians who have treated the claimant for an allegedly disabling condition for a

19   long period of time.[2]  In addition, the more detail a physician provides concerning

20

21

22

---

23   [2] *See, e.g., Kibel v. Aetna Life Ins. Co.*, 2015 WL 858751, *7 (C.D. Cal. Feb. 26,
     2015) ("The record's great constant is Dr. Andersson: he was a board-certified

24   neurologist that treated Ms. Kibel from her disease's inception, including numerous
     in-person examinations. Thus, his reports are very credible"); *Hodjati v. Aetna Life*

25   *Ins.*, 2014 WL 7466977, *14 (C.D. Cal. Dec.29, 2014); *Oldoerp v. Wells Fargo &*
     *Company Long Term Disability Plan*, 12 F.Supp.3d 1237, 1255 (N.D. Cal. 2014)

26   ("when an in-person medical examination credibly contradicts a paper-only review
     conducted by a professional who has never examined the claimant, the in-person

27   review may render more credible conclusions"); *see also Salomaa v. Honda Long*
     *Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011) (ascribing more weight to

28   the opinions of physicians who personally examined the patient and described
     plaintiff's inability to work in great detail).

the bases for his or her diagnosis and opinion, the more weight his or her conclusions are afforded.[3]

52.     In addition, by highlighting statements in the claim file that support a denial of Plaintiff's claim, such as those about normal gait and intact strength at some visits, while ignoring pertinent evidence to the contrary, both LINA and its physician consultants engaged in an arbitrary and biased handling of Plaintiff's file. That is improper under the law and establishes that LINA's decision was incorrect. *See Winkler v. Metropolitan Life Ins. Co.*, 170 F.App'x 167, 168 (2d Cir. 2006) (stating that an insurer "may, in exercising its discretion, weigh competing evidence, but it may not, as MetLife did here, cherry-pick the evidence it prefers while ignoring significant evidence to the contrary"); *Stuart v. CVS Corp.*, 2010 WL 890181, at *6 & n. 3 (E.D. Mich. Mar. 10, 2010) (finding an administrator's decision to deny benefits to be arbitrary and capricious where a file-review physician's report indicated that the physician had "selectively cherry-pick[ed] the medical records to support his non-disability finding").

53.     LINA's decision to deny Plaintiff's disability benefits based on the "paper reviews" of Drs. Sentef and Padiyar was highly improper, as such a course of action has been criticized by the Ninth Circuit.  *See Montour v. Hartford Life & Accident*, 588 F.3d 623, 630 (9th Cir. 2009) (citing *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)).

---

[3] *See, e.g., Carrier v. Aetna Life Ins. Co.*, 2015 WL 4511620, *12 (C.D. Cal. July 24, 2015) ("Nevertheless, the Court finds Dr. Corrado's conclusions sounder than those presented by the peer reviewers.  Many of the opinions rendered by these reviewers are presented in conclusory fashion, making it unclear how they reached such starkly contrasting results from those of Dr. Corrado despite reviewing the same materials"); *Ondersma v. Metro. Life Ins. Co.*, 2007 WL4371422, at *5 (N.D. Cal. Dec. 12, 2007) ("Here, by contrast, the opinion offered by Dr. Dixit is not conclusory in nature.  The basis for his opinion is disclosed.  Specifically, he details particular symptoms from which plaintiff suffers, including symptoms he directly observed or found to exist as a result of his examinations; further, he identifies functional limitations typically resulting from such specified symptoms and explains why plaintiff's symptoms, in particular, would cause her to be so limited"); *Williams v. United Omaha Life Insurance Co.*, 2013 WL 5519525, at *12 (N. D. Ala. Sept. 30, 2013).

54.     Furthermore, Plaintiff's inability to sit for an extended period of time alone compels the conclusion that she is disabled and unable to perform the duties of a sedentary occupation.[4] **Here, Dr. Buckhorn opined that Plaintiff can tolerate sitting, standing and walking for, at most, 2.5 hours in an eight-hour workday**.

55.     LINA also failed to have any physician examine Plaintiff in person, even though the Plan permits such an examination.  This failure to conduct an in-person examination raises additional questions about the credibility of Dr. Sentef's and Dr. Padiyar's opinions and the accuracy of LINA's benefits denial.[5]

56.     Plaintiff has exhausted her administrative remedies, based on LINA's June 23, 2020 letter denying her LTD appeal.  As such, Plaintiff has the right to bring a legal action for benefits under ERISA Section 502(a).

57.     The proper standard of review is de novo.  LINA does not have discretionary authority pursuant to California Insurance Code Section 10110.6, and it erred in denying Plaintiff's claim.[6]

58.     When conducting a de novo review of the record, the court does not give deference to the claim administrator's decision, but rather determines in the

---

[4] In *Armani v. Northwestern Mutual Life Insurance Co.*, 840 F.3d 1159 (9th Cir. 2016), the Ninth Circuit held that, where the claimant's attending physicians agreed that he could sit for, at most, four hours in an eight-hour workday, he was unequivocally disabled from performing his own sedentary occupation as a full-time controller (and from any other sedentary occupation), because sedentary jobs require mostly sitting, generally for at least six hours per day. *See also Mohamed Ahmed Mokbel-Aljahmi v. United Omaha Life Insurance Company,* 2017 WL 3700992 (August 28, 2017) (Sedentary work will generally involve sitting for at least six hours out of an eight-hour work day.).

[5] *See Shaw v. AT&T*, 795 F.3d 538, 550 (6th Cir. 2015) ("[T]he failure to conduct a physical examination, where the Plan document gave the plan administrator the right to do so, 'raise[s] questions about the thoroughness and accuracy of the benefits determination.'"); *see also Schramm v. CNA Fin. Corp. Insured Grp. Ben. Program,* 718 F.Supp.2d 1151, 1164 (N.D. Cal. 2010) ("The Court likewise gives little weight to the opinions of Drs. Marion and Fuchs.  Although they reviewed plaintiff's medical records, they did not examine her in person.").

[6] The Plan was offered, issued, delivered or renewed on or after January 1, 2012, but before September 5, 2019.  The Plan was first offered to Plaintiff, a California resident, in April 2012 and renewed every year thereafter.  As such, any grants of discretion that can be deemed to be a part of the Plan are void and unenforceable, and thus the denial of benefits at issue must be reviewed de novo.

first instance if the claimant has adequately established that he or she is disabled under the terms of the plan.

59.     Regardless of the standard of review that this Court applies, LINA reached an incorrect decision, given the ample medical evidence in support of Plaintiff's disability.  LINA's denial letters failed to address the overwhelming medical evidence supporting Plaintiff's claim for LTD benefits.  LINA relied upon biased "paper reviews" of Plaintiff's medical records by unqualified medical consultants, did not examine her and failed to engage in a "meaningful dialogue" with Plaintiff regarding what additional medical evidence was needed to support her claim.  Accordingly, LINA conducted a biased claims investigation, consistent with its inherent conflict of interest, and failed to provide Plaintiff with a full and fair review of her claim, in violation of ERISA.

60.     Plaintiff is now and at all times relevant has remained "disabled" as defined in the Plan, and has at all times relevant convincingly demonstrated her total disability through medical records and other documents, information and correspondence.

## **FIRST CLAIM FOR RELIEF**

To Recover Benefits, Attorneys' Fees, Pre-Judgment and Post-Judgment Interest under ERISA Plan – 29 U.S.C. Sections 1132(a)(1)(B), (g)(1)

(Plaintiff against LINA and Does 1 through 10)

61.     Plaintiff incorporates the previous paragraphs as though fully set forth herein.

62.     ERISA Section 502(a)(1)(B), 29 U.S.C. Section 1132(a)(1)(B), permits a plan participant to bring a civil action to recover benefits due to her under the terms of a plan, to enforce her rights under the terms of a plan and/or to clarify her rights to future benefits under the terms of a plan.

63.    At all times relevant, Plaintiff has been entitled to LTD benefits under the Plan.  By denying Plaintiff's claim for benefits under the Plan, and by related acts and omissions, LINA violated, and continues to violate, the terms of the Plan, and Plaintiff's rights thereunder.

64.    LINA has failed to follow the claims-processing requirements of ERISA and of the Department of Labor Regulations, and has failed to conduct a "full and fair review" of the claim denial, as required by 29 U.S.C. Section 1133(2).  Thus, even if the Plan vests discretion in LINA to make benefit determinations, no deference is warranted with regard to LINA's handling of this claim.  *See Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1465 (9th Cir. 1997); *Jebian v. Hewlett-Packard Company Employee Benefits Organization Income Protection Plan*, 349 F.3d 1098, 1105 (9th Cir. 2003) ("When decisions are not in compliance with regulatory and plan procedures, deference may not be warranted.").

65.    A "prudent person" standard is imposed on ERISA fiduciaries.  *See* 29 U.S.C. Section 1104(a)(1)(b).  A "fiduciary" is also under a duty of loyalty and care to the beneficiaries of the Plan.  *See* 29 U.S.C. Section 1104(a)(1).  Under ERISA: (1) a fiduciary must discharge its duties solely in the interest of plan participants and beneficiaries and for the exclusive purpose of providing plan benefits to them; (2) a fiduciary must act with care, skill, prudence and diligence; and (3) a fiduciary may not act in any capacity involving the Plan, on behalf of a party whose interests are adverse to the interests of the Plan, its participants or its beneficiaries.  LINA's handling of Plaintiff's disability benefit claim falls far short of these standards.

66.    For all of the reasons set forth above, the decision to deny disability insurance benefits was arbitrary, capricious, wrongful, unreasonable, irrational, contrary to the evidence, contrary to the terms of the Plan and contrary to law.  LINA abused its discretion in deciding to deny this claim, as the evidence shows its denial decision to be arbitrary and capricious.  Further, LINA's denial decision and related actions heighten the level of skepticism with which a court views a

conflicted administrator's decision under *Abatie v. Alta Health & Life Insurance Co.*, 458 F.3d 955 (9th Cir. 2006), and *Metropolitan Life Insurance Co. v. Glenn*, 544 U.S. 105 (2008).  LINA's denial of Plaintiff's claim constitutes an abuse of discretion, as evidenced by the aforementioned conduct.

67.     As a direct and proximate result of LINA's denial of disability benefits, Plaintiff has been deprived of disability benefits from October 2017 to the present, which has caused her to experience undue stress and severe financial hardship.

68.     As a direct and proximate result of the denial of her claim for disability benefits, Plaintiff has been required to incur attorneys' fees to pursue this action and is entitled to reimbursement of these fees pursuant to 29 U.S.C. Section 1132(g)(1).

69.     A controversy now exists between the parties as to whether Plaintiff is disabled as defined in the Plan and therefore entitled to disability benefits.  Plaintiff seeks the declaration of this Court that she meets the Plan's definition of "disability" and is entitled to those benefits under the Plan.  In the alternative, Plaintiff seeks a remand to the claims administrator for a determination of Plaintiff's claim that is consistent with the terms of the Plan.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court grant the following relief against all Defendants:

1.     For all Plan benefits due and owing Plaintiff, including LTD benefits.

2.     For costs and reasonable attorneys' fees, pursuant to 29 U.S.C. Section 1132(g).

3.     For pre-judgment and post-judgment interest on the principal sum, accruing from the date the obligations were incurred.  *See Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 627 (9th Cir. 2007) ("A district court may award prejudgment interest on an award of

1   ERISA benefits at its discretion."); *Drennan v. General Motors Corp.*,

2   977 F.2d 246, 253 (6th Cir. 1992).  Specifically, Plaintiff seeks interest

3   at the rate of 10% per annum, pursuant to California Insurance Code

4   Section 10111.2.

5   4.   For such other and further relief as this Court deems just and proper.

6

7   Dated:  October 1, 2020                    **MCKENNON LAW GROUP PC**

8

9   By: _____

10                                              ROBERT J. McKENNON
                                              ANDREA SOLIZ

11                                              Attorneys for Plaintiff,
                                              Brenda McGuire

<u>CERTIFICATE OF SERVICE</u>

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action; my business address is 20321 SW Birch St., #200, Newport Beach, California 92660; Fax 949-464-9714; E-mail address: xx@mckennonlawgroup.com.

I hereby certify that on Click here to enter a date., I served the foregoing documents described as: COMPLAINT FOR RECOVERY OF ERISA PLAN BENEFITS; ENFORCEMENT AND CLARIFICATION OF RIGHTS; PRE-JUDGMENT AND POST-JUDGMENT INTEREST AND ATTORNEYS' FEES on the interested parties as follows:

[Insert]                                                    Attorneys for [Insert]
                                                              ☐ ECF Participant

☐ **ECF/CM:** I caused a true and correct copy thereof to be electronically filed using the Court's Electronic Court Filing ("ECF") System and service was completed by electronic means by transmittal of a Notice of Electronic Filing on the registered participants of the ECF System.  I served those parties who are not registered participants of the ECF System as indicated below.

☐ I placed the ☐ original ☐ a true copy thereof enclosed in sealed envelope(s) to the notification address(es) of record and caused such envelope(s) to be delivered by ☐ **FIRST-CLASS MAIL** ☐ **OVERNIGHT DELIVERY**.

☐ **BY E-MAIL:** I electronically transmitted a true and correct copy thereof to the notification electronic mail address(es) of record before close of business for the purpose of effecting service and the transmission was reported as complete and without error.

☐ **FACSIMILE:** Based on ☐ courtesy ☐ court order ☐ agreement of the parties, I caused a true copy thereof to be served by transmitting via facsimile machine to the notification facsimile number(s) of record before close of business.  The transmission was reported as complete, without error.

☐ **PERSONAL DELIVERY:** I caused ☐ the original ☐ a true copy thereof to be delivered by hand to the notification address(es) of record by an employee or independent contractor of a registered process service.

I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under penalty of perjury under the laws of the Unites States of America and the State of California that the above is true and correct.  Executed at Newport Beach, California on Click here to enter a date..

NAME: _____          _____
                                                              (Signature)