JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| BRENDA McGUIRE, | Case No.: SACV 20-01901-CJC (JDEx) |
| Plaintiff, | MEMORANDUM OF DECISION |
| v. | |
| LIFE INSURANCE COMPANY OF NORTH AMERICA and DOES 1 through 10, inclusive, | |
| Defendants. | |

## I. INTRODUCTION

Plaintiff Brenda McGuire was employed as a community relations manager for Republic Services ("Republic") until April 18, 2017, at which point she ceased work. (*See* Dkt. 20-1 [Administrative Record, hereinafter "AR"] at 1417.)  About two years later, McGuire submitted a claim for long-term disability ("LTD") benefits under the Republic Services Employee Welfare Benefit Plan (the "Policy") to Life Insure Company of North America ("LINA"), which is responsible for administering the Policy.  (*See id.* at 1415.)  LINA denied her claim in the first instance and affirmed that denial after McGuire appealed.  (*See id.* at 1415, 1540)

McGuire challenges LINA's denial of LTD benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461.  After a bench trial on the administrative record, the Court finds that LINA abused its discretion in denying McGuire's claim and hereby **REMANDS** the matter to LINA to determine whether McGuire cannot "perform the material duties of any occupation for which . . . she is, or may be reasonably become, qualified" pursuant to the Policy (the "Any Occupation" condition).  (*Id.* at 1924.)

## II. BACKGROUND

### A. Relevant Terms and Conditions of the Policy

The Policy defines "Disability/Disabled" as follows:

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is:
1. unable to perform the material duties of his or her Regular Occupation; and

> 2. unable to earn 80% or more of his or her Indexed Earnings from working in his or her Regular Occupation.
>
> After Disability Benefits have been payable for 24 months, the Employee is considered Disabled if, solely due to Injury or Sickness, he or she is:
> 1. unable to perform the material duties of any occupation for which he or she is, or may reasonably become, qualified based on education, training or experience; and
> 2. unable to earn 60% or more of his or her Indexed Earnings.

(*Id.* at 1924.) It further defines "Regular Occupation" as "[t]he occupation the Employee routinely performs at the time the Disability begins," considering "the duties of the occupation as it is normally performed in the general labor market in the national economy" rather than "work tasks that are performed for a specific employer or at a specific location." (*Id.* at 1942.) The "Elimination Period," i.e., "the period of time an Employee must be continuously Disabled before Disability Benefits are payable," is 180 days. (*Id.* at 1924, 1931.)

### B. Employment and Injury

McGuire began working for Republic in 1981, and her most recent position there was community relations manager. (*See id.* at 1417.) She was responsible for coordinating and organizing efforts to represent Republic within the community, including planning and supervising programs, assisting with marketing, and liaising with community leaders and organizations. (*See id.*) Her job required prolonged periods of sitting, standing, walking, keyboarding, repetitive hand movements, driving, and lifting of up to twenty pounds as well as significant cognitive demands. (*See id.* at 1417, 1908–10.) She was employed at Republic her entire adult life and regularly worked ten to twelve hours per day. (*See id.* at 1457.)

In December 2005, McGuire was injured. She was on a stage preparing for an employee recognition and holiday event when she accidentally fell backwards. (*See id.*) She landed on her backside on the concrete floor below. (*See id.*) By March 2006, she reported "start[ing] [to] experienc[e] intense chronic pain in [her] neck, stabbing pain in [her] shoulders[,] and tingling and numbness in [her] right arm/hand" as well as "pain in [her] right leg." (*Id.*) But she endured the pain and kept working for Republic for another eleven years until April 2017, when, she says, "the pain had become so debilitating that [she] could no longer" continue. (*Id.*) The pain bled over into other aspects of her life beyond work. McGuire felt like it "alter[ed] her personality" and made her "irritable and impatient." (*Id.* at 1548.) It affected her ability to participate in community charitable and volunteer organizations, to perform basic household chores, to engage in leisure activities like walking, golf, and travel—even to sleep. (*See id.* at 1548–59, 1561–63.)

### C. Treatment History

During and around the Elimination Period, McGuire visited a variety of medical providers for issues related to her injury and the subsequent deterioration of her condition. Dr. Navid Ghalambor, an orthopedist with experience in the upper extremities, had treated McGuire since 2006 for issues related to her injury. (*See id.* at 1234.) On April 18, 2017—the day after McGuire ceased work—she visited Dr. Ghalambor. (*See id.* at 409.) He wrote in his physician's progress report for her workers' compensation claim that she had cervical radiculopathy, increasing pain radiating from her neck through her right arm, and several objective corroborating indicia, including disk bulges in her spine. (*See id.*) Dr. Ghalambor also noted that McGuire could not work through the end of April. (*See id.*) He then saw McGuire on May 1, 2017, noting again her pain, her disk bulges, and the ineffectiveness of epidural steroid injections. (*See id.* at 408.) Indeed, Dr. Ghalambor saw McGuire many more

times, including on May 12, June 5, June 29, July 17, August 28, November 9, and December 18, 2017.  (*See id.* at 400–07.)  He recorded pain in her neck down to her right hand, anatomical observations like disc bulges, appointments with other specialists, and attempts at treatment (like tramadol, a pain medication, and acupuncture)—and he concluded that she was temporarily totally disabled and could not work.  (*See id.*)

McGuire also visited Dr. Kambiz Hannani, an orthopedic spine surgeon.  (*See id.* at 912.)  Based on an appointment on March 21, 2017, just before she left work on April 17, Dr. Hannani noted in a workers' compensation evaluation her cervical radiculopathy, her neck pain, magnetic resonance imaging (MRI) results from a week prior "show[ing] significant foraminal stenosis" on her spine, and a prescription for epidural steroid injections.  (*Id.* at 921–23.)  She visited Dr. Hannani several times thereafter, including on June 8 and July 12, 2017, and he noted her persistent pain, attempts at treatment (such as physical therapy and injections), and cervical x-ray results showing significant collapse in parts of her spine.  (*See id.* at 945, 1004–07, 1019–22.)

Other providers whom McGuire visited during the Elimination Period recorded comparable information.  In summer 2017, McGuire visited Dr. Mark Anderson, a neurosurgeon.  He recorded on August 14 McGuire's reports of pain, a positive Lhermitte's sign (an electric shock-like sensation related to the neck) for neurological impingement, and weakness in her upper extremities and deemed her totally temporarily disabled.  (*See id.* at 1033–38.)  After undergoing another MRI, McGuire again visited Dr. Anderson, who concluded that she had "a very large herniated disk," "fragments in the canal and descending from the C5-6 right disc space," "debris including spur and disc with marked to severe neurological compromise," and "cervical degenerative changes . . .with a marked right foraminal stenosis."  (*Id.* at 1046.)  He also advised McGuire that she was a surgical candidate, that complications, though unlikely, can be as severe as further nerve damage and death, and that she faced an approximately ten

percent chance that her symptoms would not resolve.  (*See id.* at 1047.)  Likewise, from at least July 3 through August 8, 2017, Changok Kim, McGuire's acupuncturist, noted pain radiating from her neck through her right arm and her bulging disc issue.  (*See id.* at 505–09.)  Dr. David Topping, a chiropractor, noted her pain when he treated her from September 2017 through much of 2019, culminating in her remark to Dr. Topping in November 2018 that she "hurt all over."  (*Id.* at 603–10.)

After the Elimination Period had concluded, McGuire visited additional providers who painted a similar picture.  For example, from April 2018 through the end of the year, she visited Dr. Raafat Mattar, a pain-management specialist, and consistently reported neck and right arm pain and challenges in performing basic activities, such as stirring, vacuuming, writing, keyboarding, and sitting, for prolonged periods in a day, as well as sleeping.  (*See id.* at 691–98, 701–12.)  He also noted tenderness to palpation over muscles around her spine and her diagnoses of a disc herniation and cervical radiculopathy.  (*See id.* at 713–25; *see also id.* at 752–56, 760–71.)  Around the same time, McGuire began seeing Dr. Carl Buckhorn, an internist and her primary care physician at the time that she submitted the LTD benefits claim at issue here.  (*See id.* at 1464.)  In June 2019 in response to LINA's inquiry, Dr. Buckhorn noted several activity limitations, such as sitting, standing, walking, reaching, grasping, lifting, and carrying for more than two-and-a-half hours per day.  (*See id.* at 535–37.)  He also noted her history of chronic pain, x-ray and MRI results from late 2019 showing herniated discs, degenerative spinal changes, foraminal narrowing in her spine, and a bulging disc abutting a nerve root.  (*See id.* at 1464–65.)  In his professional opinion, she was unable to work.  (*See id.*)

McGuire also underwent a comprehensive Agreed Medical Evaluation for her workers' compensation claim by Dr. Peter Newton, an orthopedic surgeon, in late 2018 and early 2019.  (*See id.* at 1208, 1233, 1266.)  He diagnosed McGuire with chronic neck

and back pain stemming from her radiculopathy and spine issues, noting that "[s]he has multiple levels of significant abnormality both on x-ray and MRI" and that the "objective findings on the x-ray and MRI verify her subjective complaints at multiple levels." (*Id.* at 1228, 1249.) Dr. Newton also noted that McGuire's cervical condition was in such a state because of the injury in 2006 and "the continuous trauma of her work through 04/21/17" and that her combined cervical and lumbar issues induced "significant loss of function with activities of daily living." (*Id.* at 1269, 1271.) He further noted that McGuire "should have been able to continue working" as of April 21, 2017, if she had been accommodated—but if not, "she would have been considered [totally temporarily disabled] through 10/08/18." (*Id.* at 1250.)

### D. Initial Claim for Long-Term Disability Benefits

After her workers' compensation ended, and two years after she ceased work, McGuire filed a claim for LTD benefits under the Policy with LINA. (*See id.* at 256.) LINA then began its claims investigation process, gathering McGuire's prior medical records and submitting them to Dr. Joseph Sentef, a physician board certified in occupational and family medicine, for a medical review. (*See id.* at 1885, 1889.) Dr. Sentef's review was based solely on McGuire's records, as he did not perform an in-person examination. (*See id.* at 1885–86.)

On September 5, 2019, LINA denied McGuire's claim. LINA relied on Dr. Sentef's findings that McGuire was not functionally limited. (*See id.* at 1888.) As his grounds, Dr. Sentef stated that (1) "no neurological deficits" were "documented," (2) McGuire's "gait [was] noted as normal," (3) she did "not use any assistive devices," (4) the "MRI of the cervical spine is consistent with age related changes," (5) electromyography ("EMG") results "of the upper extremity [were] normal with no evidence of radiculopathy, neuropathy, or plexopathy," (6) McGuire "declined potential

surgery" for "alternative treatment," and (7) "[b]ased on lack of neurological deficits in the lumbar area, no other studies (e.g., EMG/NCS) were required to rule out radiculopathy, plexopathy or neuropathy of the lumbar spine." (*Id.*) Thus, LINA concluded that "the medical information on file does not support restrictions or limitations that would preclude [her] from performing your own occupation as a Public-Relations Representative which is a sedentary occupation per the Dictionary of Occupational Titles." (*Id.* at 1526.) "A sedentary occupation," LINA noted, involves:

> Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects, including the human body. Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met.

(*Id.* (emphasis omitted).) LINA acknowledged that it reviewed her workers' compensation paperwork and, "[w]hile she may be considered disabled from [that] perspective, it was determined that the medical records do not support restrictions that would prevent [her] from performing the material duties of her own occupation," without further elaboration. (*Id.*)

### E. Appeal of Claim Denial

McGuire appealed LINA's denial of her LTD benefits claim, which LINA upheld. (*See id.* at 1534, 1540.) LINA provided McGuire's records to Dr. Krishna Padiyar, a physician board certified in occupational medicine. (*See id.* at 1544.) Like Dr. Sentef, Dr. Padiyar relied solely on the paper trail, not on any in-person examination. (*See id.* at 1544–45.) Upon review of the records, Dr. Padiyar acknowledged that McGuire's clinical information substantiated her reports of pain and diagnosis of radiculopathy and,

accordingly, her functional impairment from April 18 to August 13, 2017, and January 16, 2020, onwards—in other words, approximately the first four months, but not the last two months, of the Elimination Period. (*See id.* at 1549.)  Dr. Padiyar cited EMG results from August 14, 2017, allegedly showing that McGuire's upper right extremity was normal and the lack of correlating clinical findings.  (*See id.*)  Citing these findings, LINA concluded that McGuire was not disabled for the entirety of the Elimination Period as the Policy required and, accordingly, she was entitled to no LTD benefits.  (*See id.* at 1526–28, 1534–43.)

## III.  DISCUSSION

### A.  Standard of Review

The parties agree that the applicable standard of review is abuse of discretion.  (*See* Dkt. 28 [Joint Stipulation Re Standard of Review] at 1.)  Under this "standard, a plan administrator's decision 'will not be disturbed if reasonable.'  This reasonableness standard requires deference to the administrator's benefits decision unless it is '(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record.'"  *Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 929 (9th Cir. 2012) (citations omitted).  In general, a district court may review only the administrative record when considering whether a plan administrator abused its discretion.  *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 969–70 (9th Cir. 2006).

### B.  LINA's Denial of Benefits Was Unreasonable

In reviewing the reasonableness of a plan administrator's decision in an ERISA suit, a court may look to a variety of factors.  Among these are:

> the quality and quantity of the medical evidence, whether the plan administrator subjected the claimant to an in-person medical evaluation or relied instead on a paper review of the claimant's existing medical records, whether the administrator provided its independent experts "with all of the relevant evidence," and whether the administrator considered a contrary SSA disability determination, if any.

*Montour v. Hartford Life & Acc. Ins. Co.*, 588 F.3d 623, 630 (9th Cir. 2009) (citation omitted). With this standard in mind, and considering the totality of the circumstances, the Court finds that LINA's denial of LTD benefits to McGuire was unreasonable.

To start, LINA decided "to conduct a 'pure paper' review in this case, that is, to hire doctors to review [McGuire's] files rather than to conduct an in-person medical evaluation of" her, which casts some doubt on the reasonableness of its physicians' findings and stands in contrast to the findings of McGuire's treating physicians. *Montour*, 588 F.3d at 634. ERISA may not categorically mandate an in-person examination, but whether a plan administrator arranges such an examination matters. A doctor who performs only a paper review inherently cannot have "all of the relevant evidence," thus "rais[ing] questions about the thoroughness and accuracy of the benefits determination." *Id.* (citation omitted).

Another "matter . . . weigh[ing]" against the reasonableness of LINA's "decision" is "a procedural irregularity." *Abatie*, 458 F.3d at 972. ERISA's implementing regulations require that LINA have "consult[ed] with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment." 29 C.F.R. § 2560.503-1(h)(3)(iii). But here, LINA hired two doctors board certified in occupational medicine (and, for one of the two, in family medicine), whereas the nature of McGuire's condition—pain in the neck, back, and extremities and spinal abnormalities—are best suited to neurologists, orthopedists, and pain specialists, such as

McGuire's treating physicians. *See Kunin v. Benefit Tr. Life Ins. Co.*, 910 F.2d 534, 537–38 (9th Cir. 1990) (noting a physician lacked "any significant experience with or particular expertise concerning autism" in concluding that a plan administrator abused its discretion in an ERISA suit).

Also telling is that LINA's "reasons for denial were shifting and inconsistent." *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 678 (9th Cir. 2011); *see also Demer v. IBM Corp. LTD Plan*, 835 F.3d 893, 906–07 (9th Cir. 2016) (noting conflicting assessments by plan administrator's doctors regarding claimant's functional capabilities in concluding administrator abused its discretion). Dr. Sentef concluded at the initial claims stage that McGuire had no functional limitations—period. But on appeal of the claim, Dr. Padiyar concluded that McGuire had well-founded functional limitations through at least the first four months of the Elimination Period. Why LINA's medical reviewers reached flatly contradictory conclusions, especially in the face of voluminous documentation of McGuire's pain and of her anatomical abnormalities, is unexplained and puzzling. LINA's "shifting rationales provide some evidence that it desired a certain result and summoned up various rationales to reach it," which "contravenes the purpose of ERISA and is the essence of an abuse of an insurance provider's discretion." *Collins v. Liberty Life Assurance Co. of Bos.*, 988 F. Supp. 2d 1105, 1130 (C.D. Cal. 2013).

All these points confirm, moreover, what the overwhelming "quality and quantity of the medical evidence" point toward, *Montour*, 588 F.3d at 630—that McGuire could not work. Her treating physicians consistently noted her subjective reports of pain and cervical radiculopathy before, during, and after the Elimination Period. They consistently noted x-ray and MRI results evincing disc bulges, foraminal stenosis, or collapsing in parts of her spine. And Dr. Ghalambor, the physician primarily in charge of completing paperwork related to McGuire's workers' compensation claim during the Elimination

Period, as well as Dr. Anderson noted time and again that McGuire was unable to work or was disabled. Indeed, the record belies several propositions upon which LINA's reviewers based their contrary conclusions that McGuire could work. For example, Dr. Sentef asserted in categorical terms that "no neurological deficits" were "documented" and the "MRI of the cervical spine is consistent with age related changes." (AR at 1888.) But there clearly was *some* evidence of deficit, such as upper-extremity weakness and a positive Lhermitte's sign for neurological impingement, and his opinion on the cause of spinal changes flies in the face of the determination of every treating physician that McGuire's cervical issues resulted from the injury and continued trauma of work. And Dr. Padiyar's conclusion that McGuire no longer had functional limitations in August 2017 focused solely on her upper right extremity and made no mention of potential limitations based on her neck pain. LINA's reasons for denial are thus borderline "illogical," *Salomaa*, 642 F.3d at 678, and certainly defy the thrust of the record.

In defending its denial, LINA appears to take issue with McGuire's treating physicians, especially Dr. Ghalambor, not specifying the minutiae of McGuire's functional limitations to the degree that LINA would have liked. (*See* Dkt. 31 [Defendant Life Insurance Company of North America's Opening Trial Brief, hereinafter "LINA Tr. Br."] at 16–18.) That is no excuse for LINA's decision. "A plan administrator abuses its discretion if it . . . fails to develop facts necessary to its determination." *Pac. Shores Hosp. v. United Behavioral Health*, 764 F.3d 1030, 1042 (9th Cir. 2014); *see also Young v. Sun Life & Health Ins. Co.*, 285 F. Supp. 3d 1109, 1132 (E.D. Cal. 2018) (citing plan administrator's failure to ask physician about claimant's ability to work full time consistently in ruling against it in ERISA suit). LINA failed to do so here. McGuire's treating physicians during the Elimination Period clearly noted her significant, chronic pain and the objective indicia corroborating her reports, and they deemed her unable to work. LINA never asked these physicians for clarification about the specifics of her limitations—the only treating physician whom LINA apparently attempted to contact was

Dr. Buckhorn.  (*See* AR at 1549.)  If LINA had lingering questions about McGuire's exact functional limitations to substantiate her disability during the Elimination Period, LINA should have contacted these other physicians.

LINA then claims that McGuire's EMG tests, a type of nerve study "designed to test for a nerve disorder," yielded normal results in August 2017, October 2018, and January 2019 and "do not support that [she] was disabled or unable to perform her occupation."  (LINA Tr. Br. at 17–18.)  EMG is of course a useful diagnostic tool, but it is not the be-all and end-all.  "[N]ormal EMG results in a patient with signs and symptoms consistent with a cervical radiculopathy do not exclude the diagnosis of cervical radiculopathy."  Gerard A Malanga et al., *Cervical Radiculopathy Workup*, Medscape, https://emedicine.medscape.com/article/94118-workup (last updated Oct. 8, 2018).  Further, "while a plan may consider the lack of objective medical evidence in making a benefits determination, 'reliance on objective evidence can be problematic for medical conditions that are not amenable to objective verification.'"  *Dimry v. Bert Bell/Pete Rozelle NFL Player Retirement Plan*, 487 F. Supp. 3d 807, 816 (N.D. Cal. 2020) (citation omitted).  Epitomizing this point is pain.  *See, e.g.*, *Montour*, 588 F.3d at 635 ("It would probably have been unreasonable for Hartford to require Montour to produce objective proof of his pain level . . . ."); *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 873 n.3 (9th Cir. 2008) ("While the rules and presumptions of our Social Security [("SS")] case law do not apply to ERISA benefits determinations, our [SS] precedents are relevant for the factual observation that disabling pain cannot always be measured objectively—which is as true for ERISA beneficiaries as it is for [SS] claimants."  (citation omitted)).  And LINA's reliance on negative EMG results ignores the plethora of other objective evidence from, for example, x-rays and MRIs, that confirm McGuire's subjective complaints of pain.

LINA claims that McGuire's "contention that her pain is completely disabling is also inconsistent with her treatment records," saying that she could walk normally, did not take pain medication continuously, and chose not to undergo a surgical procedure. (LINA Tr. Br. at 18–19.) These grounds are at best replete with half-truths and in any event are neither here nor there. McGuire's condition during the Elimination Period was *cervical* radiculopathy, manifesting as pain in her neck and right upper extremity, so it is not surprising that her gait was unaffected at times. Contrary to LINA's suggestion, McGuire did try pain medications—for example, she tried tramadol and underwent several epidural steroidal injections—and she cannot be faulted for declining to continue with oral pain medications given that they generally "carry serious risks of addiction and overdose, especially with prolonged use." *Talk to Your Doctor About Managing Your Pain*, Ctrs. for Disease Control & Prevention, https://www.cdc.gov/injury/features/manage-your-pain/index.html (last updated Dec. 16, 2020). Similarly, it is understandable that McGuire declined to undergo a significant spinal surgery—one that included nonnegligible risks of paralysis and death, among other complications—with a meaningful likelihood that her symptoms would not improve. And she nonetheless later underwent the procedure, which confirmed the spinal issues that her treating physicians had noted for years. (*See* AR at 1483–85.)

LINA then cherry picks a remark from Dr. Newton's report that McGuire "should have been able to continue working after she was taken off of work on 4/21/2017" (LINA Tr. Br. at 19 (quoting AR at 1250).) LINA neglects to mention that the very next sentence stated that "[i]f her employer could not have accommodated her, she would have been considered TTD through 10/08/18." (AR at 1250.) It is not clear what accommodations Dr. Newton was referring to, as he noted a lift restriction, then checked off "Other" and "[s]ee dictated report/work restriction form," which is not apparent from the administrative record. (*Id.*) That alone should have been a sign to LINA to ask for clarity (which it did not). Moreover, LINA does not dispute that McGuire did not receive

accommodations (whatever they may be) from Republic or that she was legally entitled to them such that she could work somewhere else. In any event, Dr. Newton's statements must be read in the context of the whole report, which also stated that McGuire's condition induced "significant loss of function with activities of daily living." (*Id.* at 1271.)

Finally, it is also probative that McGuire "had no motivation to malinger." *Stratton v. Life Ins. Co. of N. Am.*, — F. Supp. 3d —, No. 20-CV-2037, 2022 WL 712926, at *28 (S.D. Cal. Mar. 8, 2022). All the evidence in the record suggests McGuire was a hardworking employee. She worked at Republic for decades, basically since graduating from high school, and continued to work at Republic for over a decade after her injury—until the pain became unbearable. LINA points to nothing in the record to suggest her pain was exaggerated or a cop-out from employment.

Considering all this evidence, the Court finds that LINA's denial was unreasonable. LINA may have discretion in adjudicating claims under the Policy, but discretion does not equate to carte blanche. McGuire has reported pain—deep, growing, and consistent pain—for years. Objective evidence from x-rays and MRIs confirmed spinal abnormalities consistent with such pain. McGuire's treating physicians time and again found her unable to work. On this record, but one conclusion is possible: LINA abused its discretion in denying her LTD benefits.

### C. Remand to LINA Is Proper

McGuire argues that the Court should find that she is disabled for purposes of the "any occupation" condition. The Court disagrees. "Where an administrator's initial denial of benefits is premised on a failure to apply plan provisions properly," the typical course of conduct is to "remand to the administrator to apply the terms correctly in the

first instance." *Pannebecker v. Liberty Life Assurance Co. of Bos.*, 542 F.3d 1213, 1221 (9th Cir. 2008); *see also Lavino v. Metro. Life Ins. Co.*, No. CV 08-2910, 2010 WL 234817, at *13 (C.D. Cal. Jan. 13, 2010) ("However, because MetLife has never had an opportunity to decide Plaintiff's case under the 'any occupation' standard, Plaintiff's request for 'any occupation' benefits is not an appropriate subject of this action. . . . Remand is proper . . . ."); *Hantakas v. Metro. Life Ins. Co.*, No. 14-cv-00235, 2016 WL 374562, at *7 (E.D. Cal. 2016 Feb. 1, 2016) ("Accordingly, the Court finds that remand is appropriate in order for MetLife to make a determination as to Plaintiff's eligibility under the 'any occupation' standard. It is the Court's job to review the administrator's decision, not make the determination in the administrator's stead."). LINA has not evaluated McGuire under the "Any Occupation" condition, so remand is warranted here.

## IV. CONCLUSION

LINA's decision to deny McGuire LTD benefits was an abuse of discretion. Accordingly, the Court awards McGuire LTD benefits under the "Regular Occupation" period of the Policy and **REMANDS** the remainder of the claim to determine whether McGuire meets the "Any Occupation" condition under the Policy.

DATED: September 21, 2022

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE